# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JANE HAN,                                          )
                                                   )
       Plaintiff,                                 )
                                                   )
       v.                                         )    No. 11 C 8560
                                                   )
WHOLE FOODS MARKET GROUP, INC.,                    )    Judge Joan H. Lefkow
                                                   )
       Defendant.                                 )

## OPINION AND ORDER

Jane Han filed a four-count complaint against her former employer, Whole Foods Market Group, Inc. ("Whole Foods"), alleging age discrimination, race discrimination, and retaliation in violation of the Age Discrimination in Employment Act ("the ADEA"), 29 U.S.C. §§ 621 *et seq.*, and Title VII of the Civil Rights Act ("Title VII"), 42 U.S.C. §§ 2000e *et seq.* Whole Foods has moved for summary judgment.[1] For the following reasons, Whole Foods' motion is granted.

## LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). To determine whether any genuine fact issue exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record to view the facts

---

[1] The court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343, and 42 U.S.C. § 2000e-5(f)(3). Venue is proper in this district under 28 U.S.C. § 1391(b). Han's exhaustion of her administrative remedies is not in dispute.

in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. Fed. R. Civ. P. 56(c); *Scott* v. *Harris*, 550 U.S. 372, 378, 127 S. Ct. 1769, 167 L. Ed. 2d 686 (2007). The court may not weigh conflicting evidence or make credibility determinations. *Omnicare, Inc.* v. *UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011). If a claim or defense is factually unsupported, the court should dispose of it at the summary judgment stage. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323-24, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Id.* at 323. In response, the non-moving party cannot rest on bare pleadings but must designate specific material facts showing there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000).[2]

## BACKGROUND

As an initial matter, the court must note that the evidence provided by both parties is incomplete, internally contradictory, and confusing. These background facts are gleaned mostly from deposition testimony with significant holes. Han's deposition is marked with inconsistent statements and confusing answers. The depositions of other Whole Foods employees also include contradictions and fail to provide a comprehensive picture of the store's policies. Although the court has made every attempt to credit the evidence presented and make inferences

---

[2] The facts in the background section are taken from the parties' Local Rule 56.1 statements of facts and construed in the light most favorable to Han. Whole Foods' Rule 56.1 statement (dkt. 65) is referred to as "Def. L.R. 56.1," and Han's response to that statement (dkt. 73) as "Pl. L.R. 56.1 Resp." Han's 56.1 statement of additional facts (dkt. 73) is referred to as "Pl. L.R. 56.1," and Whole Foods' response to that statement (dkt. 78) as "Def. L.R. 56.1 Resp." The court will address many but not all of the factual allegations in the parties' submissions, as the court is "not bound to discuss in detail every single factual allegation put forth at the summary judgment stage." *Omnicare*, 629 F.3d at 704. In accordance with its regular practice, the court has considered the parties' objections to statements of fact and included in this background only those portions of the statements and responses that are appropriately supported and relevant to the resolution of this motion.

in favor of Han, it is the non-moving party's responsibility to support her case on summary judgment and point to disputes of material fact that make the case appropriate for trial. The court cannot take Han's subjective speculations as fact where she failed to adduce sufficient evidence to support her contentions during discovery. Summary judgment is the time to discard such unsupported claims.

## I.    Han's Employment With Whole Foods

Han was born in China on March 21, 1952. She began working at the Whole Foods store in Lincoln Park, Chicago ("the Lincoln Park Whole Foods") in August 2003. Prior to this, she worked as a cook at a Whole Foods in River Forest and had a license to cook.[3] In 2003, Han was hired to work full time in the prepared foods department. She was paid at a rate of $9.50 per hour. Han was assigned to the salad bar, which she stocked and cleaned, and for which prepared items.

When she was hired by Whole Foods, Han signed an acknowledgment indicating that she had received Whole Foods' General Information Guide ("the GIG"), which contains Whole Foods' employment policies. The GIG provides that "[a]ll merchandise is to be paid for at the cash register before it is consumed or taken home." (Dkt. 65, Ex. E ("GIG") at 58.) Violating this policy is a "major infraction[ ]" that "may lead to discharge." (*Id.* at 43.) As an exception to this policy, a cook employed at Whole Foods may taste up to two ounces of a food he is preparing to offer to customers for sale. The GIG also tells employees to "keep receipts for your purchases throughout the day" and that if an employee "can't produce a receipt, the product will

---

[3] The parties disagree about when Han began working for Whole Foods and whether she worked at different Whole Foods stores before working at the Lincoln Park location. (*Compare* P. L.R. 56.1 Resp. ¶ 1 *with* Def. L.R. 56.1 Resp. ¶ 94.) This disparity in dates is not a material fact.

be considered stolen."[4]  (*Id.* at 58.)  Han was aware that she could be terminated for consuming an item without paying for it.

## II.    Han's Shift Change

When Han began working at the Lincoln Park Whole Foods, she worked from 6:30 a.m. until 2:00 p.m.  Her shift was then changed to a "mid-shift," from 10:00 a.m. until 6:00 p.m. (Def. L.R. 56.1 ¶ 9.)  Han had been the only person on her team to work mid-shifts, and a supervisor testified that these shifts were "not conducive to the store" and "causing some problems with other team members, since [Han] was the only [one] that was receiving that schedule."[5]  (Dkt. 65, Ex. K, Deposition of Mike Soucy ("Soucy dep.") at 49:14-50:5.)  In the spring of 2005, Jane Wild became Han's new team leader and eliminated the mid-shift.[6]  Wild assigned Han to the closing shift, from 2:00 p.m. until 10:00 p.m.  Wild received permission to change Han's shift from Mike Soucy, the associate store team leader.  Han was advised that the mid-shift was being eliminated because the salad bar was not busy enough, but she could request to have someone come help her at the salad bar if she became very busy.  Han testified that her workload increased as a result of the mid-shift elimination because "three people's work have to

---

[4]  Whole Foods also had an anti-harassment and retaliation policy, on which Han received training.  (GIG at 46.)

[5]  Han objects to introduction of this testimony as hearsay, arguing that Soucy was recounting the reasons Wild gave him for changing Han's schedule.  (Pl. L.R. 56.1 Resp. ¶ 12.)  Although this is how Whole Foods characterized the testimony, the court reads it instead as Soucy's own take on the situation and not Wild's statements to him.  In addition, Wild's statements to Soucy would be admitted, not for their truth but to demonstrate their effect on Soucy, which was to advise Wild to eliminate the mid-shift. *See, e.g., Cooper-Schut* v. *Visteon Auto. Sys.*, 361 F.3d 421, 430 (7th Cir. 2004) (affirming district court decision to admit statement for the effect that it had on the listener).

[6]  The parties do not tell the court exactly when the mid-shift was eliminated; they agree that Wild became Han's supervisor in the spring of 2005 and that after "Wild became the plaintiff's supervisor, Ms. Han's shift was eliminated."  (Def. L.R. 56.1 ¶ 10; Pl. L.R. 56.1 Resp. ¶ 10.)

be taken by two people."[7]  (Dkt. 65, Ex. 1, Deposition of Jane Han ("Han Dep.") at 68:2-3.)

When she asked for help with heavy work, however, her request was denied.[8]

## III.    Han's Relationship With Her Supervisor, Jane Wild

Soon after Wild became Han's supervisor, the two began quarrelling.  Han told her co-

workers about her disagreements with Wild, and testified at her deposition that "maybe some

people will tell her that I'm talking behind her, so she didn't like me."  (Han dep. at 75:8-10.)

Han also testified that Wild was unhappy with her after a co-worker reported negative comments

Han made about Wild on a team leadership survey.  In addition, at several meetings of the

prepared foods team, Han disagreed with Wild about the length of time items could remain on

the salad bar.  In addition, Han believed Wild disliked her because of her age and ethnicity.  (*Id.*

at 91:6-8.)  In particular, Han testified that "[Wild] said I'm an old woman."[9]  (*Id.* at 80:1-2.)

---

[7]  Whole Foods denies that Han's workload increased as a result of the shift change but presents no credible evidence to contradict this fact, instead disputing the meaning of Han's testimony.  The statement is thus deemed admitted.  *See,* N.D. Ill. L.R. 56.1(a) ("All material facts set forth in the statement required . . . will be deemed admitted unless controverted by the statement of the moving party."); *see also Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("We have consistently held that a failure to respond by the nonmovant as mandated by the local rules results in an admission."); *Malec* v. *Sanford*, 191 F.R.D. 581, 584 (N.D. Ill. 2000) ("[A] general denial is insufficient to rebut . . . factual allegations; the [opposing party] must cite specific evidentiary materials justifying the denial.").

[8]  Again, Whole Foods denies this statement without presenting any evidence supporting the denial.  Han did not state, however, that doing "heavy work" was a consequence of the mid-shift being eliminated.

[9]  Whole Foods argues that this statement is inadmissible because it is unclear whether Wild made it directly to Han; if Wild did not, Han provides no foundation for how she knows Wild made this statement.  Where an employment discrimination plaintiff "never states who told him about [a supervisor's] alleged comments," they lack evidentiary foundation.  *Alford* v. *Kendall Cnty. Dep't of Health*, No. 07 C 4528, 2008 WL 5093835, at *1 n.1 (N.D. Ill. Nov. 24, 2008).  Giving Han the benefit of the doubt, however, the court will consider the statement as if Wild made it to Han directly.  The statement is thus admissible both because it is being offered against Whole Foods and was made by its agent, Fed. R. Evid. 801(d)(2)(D), and because it is not being offered for its truth but instead to show Wild's discriminatory animus.  *See Gage* v. *Metro. Water Reclamation Dist. of Greater Chicago*, 365 F. Supp. 2d 919, 930 (N.D. Ill. 2005).  The court generally notes the poor quality of Han's deposition, which is riddled by misunderstandings and incomplete answers due perhaps to shoddy translation.

Han and Wild also disagreed over Han's job duties.  Han was asked to move or lift items about once per week, but she testified that she could not do so because they were too large or were too high for her to reach.  She also testified that it was too cold for her to go into the freezers.  In response to Han's complaints, Wild told Han that moving items in the freezer was part of her job, and at one point told Han that if she complained about Wild, she would "take the consequences."  (*Id.* at 82:11-83:2.)

Despite Han's tense relationship with Wild, there were generally few complaints about Han's performance.  Soucy testified that, to his knowledge, she had never been in any disciplinary trouble, had never been late, and had never been reported for failure to perform her job adequately.  After votes by department employees, Han won a $50 reward for being an outstanding team member in the salad bar category on two occasions.  When Wild became Han's supervisor, she eliminated the salad bar section on the ballot.  Han testified she could no longer be considered for the award.[10]  Han was never promoted while at the Lincoln Park Whole Foods.

Approximately six months before Han was terminated, Wild was promoted to Associate Store Team Leader (*i.e.*, assistant manager) and Adam Eckert became Han's direct supervisor.  Before Han was fired, however, Wild chose to step down from her managerial position and

---

Han also seeks to admit evidence that Wild told three employees they were terminated because of their age.  (Dkt. 72 at 4; Pl. L.R. 56.1 ¶ 111.)  At Han's deposition, she testified that "three old ladies . . . all African-American—were terminated of their employment because of their age.  Actually, Jane [Wild] said, You are too old and you no longer can work.  Too slow.  And so they were terminated."  (Han dep. at 91:17-22.)  Han provides no reason to admit the statement that Wild allegedly made to these employees or the alleged fact that these employees were terminated because of their age.  Han did not testify, nor does she argue in her brief, that she was present for the statements.  If someone else told her that Wild made the statements, then they would be "hearsay within hearsay" and thus inadmissible.  *See Duncan* v. *Thorek Mem'l Hosp.*, 784 F. Supp. 2d 910, 921 (N.D. Ill. 2011).

[10]  Whole Foods argues that Han could was still eligible for the award in a different category but does not provide any supporting evidence.

rejoined the prepared foods team as a team member. She did not become Han's supervisor again.

## IV.     Transfer Requests

Over the course of Han's employment at the Lincoln Park Whole Foods, she inquired about transferring to other departments and being promoted to a cook.[11]  Other than becoming a cook, these transfer requests all involved lateral transfers.  Han wished to transfer to avoid working for Wild and to avoid having to enter the freezer used by the prepared foods team.  As a vegetarian, Han also wished to move away from away from meat preparation.[12]  She testified that Whole Foods had a policy allowing employees to rotate positions.  When Han asked to be transferred, Wild would inform her there were no open positions.[13]  Wild told Han that if Han found openings in other departments, she should "let [Wild] know."  (Han dep. at 98:1-3.)  When Eckert was Han's team leader, he said that Han had to ask the other departments and they had to approve the transfer.  (*Id.* at 138:19-22.)  But, in the six months prior to Han's termination, she was told by the bakery department that a "young" Whole Foods employee had inquired about an open position in that department before Han did and that Han would "have to wait a while."  (*Id.*

---

[11]  Whole Foods admits that Han made these inquiries but denies that the positions about which she inquired were available or that Han was qualified for them.  (Def. L.R. 56.1 Resp. ¶ 99.)  As will be discussed further below, the record is unclear on whether or not becoming a cook would involve an automatic pay raise.  (*Compare* Pl. L.R. Resp. ¶ 27, *with* Def. L.R. Resp. ¶ 100.)

[12]   Han also asked Wild if she could just temporarily trade positions with someone working on the hot bar because, she asserted in her deposition, her hands were swollen from having to retrieve foods from the freezer.  (Han dep. at 93:9-94:12.)

[13]  Han argues that Wild's response was not credible, stating that there were "always openings. All the time," but provides no evidence of open positions to which she applied.  (Han dep. at 97:20.)

at 139:1-4.)  Han also requested a transfer to the produce and flower departments but was told by the department leader that there were no openings.[14]

## V.     Review and Raise Process

Performance reviews at Whole Foods, called "job dialogues," determine whether an employee will receive a raise.  Employees are eligible to receive a raise of up to $1.00 per hour based on their performance rating.  The employee and supervisor each assign the employee scores in various categories.  Typically, employees with the same scores receive similar raises.  Han testified that younger, non-Asian employees received larger raises than she during her last year of employment at Whole Foods.  In particular, she identified three employees (identified only as Amanda, Robert, and Erin) whom she claimed received $1.00 raises when she only

---

[14]  Han argues that her testimony shows she was passed over for a job in the produce department in favor of younger employees.  She cites to this exchange in her deposition:

> Q.  What did the team leader of the produce department say when you talked to him about transferring to the produce team?
> A.  They said there is no openings right now.  But, in fact, they already have younger people who started there.
> Q.  Okay.  Do you know when those younger people started?
> A.  Some of the younger ladies are Mexican, because the team leader is Mexican.
> Q.  Did those younger people start before or after you asked for a transfer to the produce team?
> A.  I started before them, because we were neighbors, and I always often went to ask Happy, the team leader at the produce department.

(Han dep. at 139:5-19.)  Han contends that this testimony shows she was told there were no openings in the produce department but then younger people started there "even though she inquired about the transfer before the younger people started."  (Pl. L.R. 56.1 ¶ 102.)  Even making all inferences in favor of Han, the court simply cannot interpret this testimony as indicating that Han *asked* to be transferred to the produce department prior to the "younger ladies" being transferred there.  That a plaintiff disagrees with an interpretation of the evidence does not constitute a dispute of material fact.  *See, e.g., Pagsuberon* v. *Chicago Tribune Co.*, 168 F. Supp. 2d 893, 897-98 (N.D. Ill. 2001) (refusing to accept plaintiff's interpretation of deposition testimony where plaintiff selectively quoted favorable portions).

received $0.25.[15]  Han provides no information about their performance ratings as compared to

her own.

Wild and Han assessed Han's work at Han's job dialogue in April 2007 in thirteen

categories, with a maximum score of five points in each category and sixty-five points total.

(Dkt. 65, Ex. N.)  Han awarded herself a sixty-two.[16]  Wild awarded her a forty-four.  Based on

this score, Han received a $0.25 raise.[17]  Soucy testified that this score would be classified as

"average to good" and would correlate to either a $0.25 or $0.50 raise.  (Soucy dep. at 40:4-21.)

[15] Whole Foods objects to the admissibility of other employees' raises by arguing that Han's basis
for this knowledge is inadmissible hearsay.  Han testified at her deposition that she knew of other raises
because the employees discussed them openly and that when she complained to human resources
employee Jennifer Walsh about her raise, Walsh did not deny that other employees received higher raises.
(Pl. L.R. 56.1 ¶ 110.)  Han argues that her complaints about other employees' raises constitute "adopted
admissions" by Walsh because "the statement . . . was made in her presence, she understood the
statement, and she had the opportunity to deny it but did not."  (Dkt. 72 at 13.)  Under the evidence rules,
a statement is admissible non-hearsay if the listening party "manifested that it adopted or believed [it] to
be true."  Fed. R. Evid. 801(d)(2)(B).  But before admitting a statement as an adoptive admission, the
court "must first find that sufficient foundational facts have been introduced for the jury reasonably to
conclude that the defendant did actually hear, understand and accede to the statement."  *Munley* v.
*Carlson*, 125 F. Supp. 2d 1117, 1120 (N.D. Ill. 2000) (quotation marks and citation omitted).  Here, the
evidence is insufficient to find that a jury could reasonably conclude Walsh acceded to the statement.
Han did not testify that Walsh was silent when Han complained about her comparably lower pay raise or
provide any evidence of how Walsh responded to Han.  Instead, Han added further hearsay by testifying,
without foundation, that Walsh then recounted Han's complaints to Erin.  Han provides no authority to
explain why Walsh's response is admissible as an adopted statement.  Moreover, as discussed below, the
court does not "think that the evidence, if admitted, would change the outcome."  *Halloway* v. *Milwaukee
Cnty.*, 180 F.3d 820, 825 (7th Cir. 1999).  The court will treat information about the alleged raises as
Whole Foods does: unsupported statements Han made in her deposition.

[16] Han disagrees, stating that she awarded herself a sixty-four.  The confusion stems from faulty
arithmetic on the score sheet: adding up the scores Han gave herself produces sixty-two, but the box on
the score sheet for "team member total" says sixty-four.  (Dkt. 65, Ex. N.)

[17] As discussed further below, Han testified that her raise was later increased to $0.50.

## VI. Han's Complaints

Han began complaining to the human resources department about Wild when Wild changed Han's shift. Han told Jennifer Walsh,[18] the payroll benefits specialist, that Wild did not like Han and was trying to make her change her shift. Han told Walsh that she believed the changes to her schedule were being made because of her age, and that her age prevented her from finding another position. Han also informed Walsh she felt that Wild's decision to change the schedule was related to Han's race because she had mentioned her desire to transfer departments. (*See* Han dep. at 112:10-15; 112:4-7.) Walsh responded that Han should try to maintain a good working relationship with Wild, and explained that the elimination of the mid-shift was a management decision. Han also complained to Richard Howley, the store team leader, about the elimination of the mid-shift. Howley responded that a team leader may eliminate shifts and positions.

In addition, Han complained to Walsh about the raise that a co-worker named Erin received. Han asserted that Erin received a $1.00 raise because Erin was dating her team leader.[19] At her deposition, Han testified that other "young" and "white" co-workers received larger raises than she, although she did not state that she voiced this complaint to Walsh. (Han dep. at 140:20-142:18.) Han also testified that after she complained to Walsh about her $0.25 cent pay raise as compared to her co-workers' $1.00 pay raise, Walsh "made the decision to give me half a dollar raise," but then also asserted that it was Eckert who made the decision to give

---

[18] Walsh is also referred to as Jennifer Brisbane in the record.

[19] While Han asserts that she told Walsh she believed Erin received the raise because Erin was "young" and "white," this is a mischaracterization. Han testified that she felt this is why Erin received the raise but not that she shared this feeling with Walsh. (*See* Han dep. at 215:20-23.)

Han the pay raise when he became Han's supervisor. (Han dep. at 109:24-110:20.) Han also testified that younger white employees Amanda and Robert received higher raises than she.

## VII.    The Danish Incident

On December 23, 2007, Han was scheduled to work from 2:00 until 10:00 p.m. Han testified that during this shift, she could take two fifteen-minute breaks and one half-hour lunch break. She was entitled to take her first break after she had worked for two hours. Han also testified that she was allowed to take "small breaks" other than the fifteen- and thirty-minute breaks to do things like purchase food and use the restroom.[20] She decided to take a break that day at 4:30 p.m., knowing the store would be busier starting around 5:00 or 6:00 p.m.[21]

The timing of what happened after that is not entirely clear, but the gist is that Wild— who had stepped down from her managerial position and rejoined the prepared foods department as a team member, not supervisor—asked to go on a break at 4:35 p.m., selected a Danish to eat on her break that she put on the salad bar, went out to her car to retrieve money to pay for the Danish, and returned to see Han eating a Danish. She reported this to Todd Stura, associate team leader of prepared foods. Wild later stated that she told Stura that she saw Han eating the Danish

---

[20]    Whole Foods objects to this fact but does not provide any competent evidence, such as official Whole Foods policy documents, to the contrary. Instead, it points to Han's testimony about asking permission to take *lunch* breaks, not unofficial breaks. (Def. L.R. 56.1 Resp. ¶ 117.) Having failed to adequately refute the statement, it is deemed admitted. In Whole Foods' statement of facts, it also points to this exchange at the deposition of Todd Stura, the associate team leader of the prepared foods department: "Q: Are employees permitted to purchase and consume items from the store when they're not on their break? A: No." (Def. L.R. 56.1 ¶ 52 (citing Dkt. 65, Ex. F at 83:3-5).) This testimony does not directly address whether employees are allowed to take informal breaks, however, and is insufficient to refute Han's assertions.

[21]    Han's deposition testimony is unclear on whether she planned to take a fifteen or thirty minute break. (*Compare* Han dep. at 153:8-9 ("I was thinking about taking my lunch break around 4:30") *with id.* at 156:1-4 (Han planned to ask supervisor for "[e]ither half an hour or 15[.] I was going to ask him.").)

that Wild was planning to buy and that she did not believe Han had a receipt. (Dkt. 74, Ex. 8.) Wild then purchased another Danish to consume on her break.[22]

Stura then went to the salad bar prep area where Han was allegedly eating the Danish. He did not see anyone so he went back onto the grocery store floor where he saw Wild standing about ten feet from the salad prep door.[23] Wild assured Stura that she was certain she had seen Han eating the Danish, which prompted Stura to return to the salad bar prep area, where he looked more thoroughly and found packaging for the Danish in the garbage can. On a shelf, he saw a piece of paper towel wrapped around what he identified as a half-consumed Danish. He confiscated it and went to the prepared foods office, where he, Thomas Duran (the associate team leader), Eckert (Han's supervisor), Soucy (Han's shift supervisor), and store security gathered. They attempted to "figure out the logistics of what had just happened and what to do about it." (Stura dep. at 51:9-11.) As far as Stura remembers, no one called Wild to the office.

_____

[22] This testimony aligns with Stura's testimony about the incident. (*See* Dkt. 65, Ex. 1, Deposition of Todd Stura ("Stura dep.") at 41:21-24; Dkt. 65, Ex. 2.) Han devotes much space to arguments about where Wild parked her car and how long it would have taken her to get to her car. (*See, e.g.,* Pl. L.R. 56.1 ¶ 119.) These are not material issues. Han also attempts to argue that the store security guard who wrote an incident report about the Danish was "already writing the report" "by 4:45 p.m." (*Id.* at ¶ 122.) She points to where the guard wrote "12-23-07 – 4:45 p.m." on the report under "DATE/TIME." (Dkt. 74, Ex. 11.) Han makes no effort to show the court why the guard would have written the date and time at which he wrote the report as opposed to the date and time at which the incident occurred. The report itself lends credence to this view: the guard writes that Han's receipt had a time stamp of 4:45 on it. (*Id.*) It does not make sense that the guard would have seen the receipt marked 4:45 p.m. but also be simultaneously writing his report. (The court also notes that both Han and Whole Foods produced a copy of the receipt, which shows Han purchased the Danish at 4:50 p.m.) Similarly, Han's argument that Stura's statements about when Wild asked to take her break and then told him about seeing Han with the Danish are not persuasive, as the times generally correlate and Stura stated that the times were an approximation. (Stura dep. at. 62:15-24.)

[23] Stura stated later that on his first trip into the salad bar prep area, Han was standing about 15 or 20 feet away at the salad bar. He testified that he believes it is "possible" that she saw him entering the salad bar prep area. (Stura dep. at 52:9-11.) Stura's deposition testimony is not entirely consistent with a statement he wrote on December 23, 2007, in which he wrote that the first time he went into the salad bar prep area he saw Han chewing as she left the prep area and noticed a paper towel bundled around something without a wrapper. (Dkt. 65, Ex. O.)

Han then entered the office and held up a receipt and pointed at the half-consumed Danish and said it was hers. Stura does not recall anything else Han said, but Soucy recalls that as soon as Han entered she "immediately said, oh, there's my Danish. That's mine." (Soucy dep. at 62:12-14.) Soucy looked at the receipt, which states that the Danish—which cost Han $1.75 with tax—was purchased at 4:50 p.m. (Dkt. 65, Ex. J; dkt. 74, Ex. 12.) Soucy remembers having this conversation with Han at around "4:53 or 4:54 p.m." (Soucy dep. at 62:21.) Han was "very adamant that that specific Danish was the one that she purchased with the receipt." (*Id.* at 63:4-8.) Soucy later wrote in a statement that he informed Han she could not have begun eating the Danish after purchasing it because she purchased it at 4:50 p.m. but the Danish had been in the office prior to that time. (Dkt. 65, Ex. O.) In a statement signed by Doran and Eckert from December 23, 2007, the two testify that Han spoke to Soucy and store security "briefly" and then came into the office stating she had a receipt for the Danish. (Dkt. 65, Ex. 2 at 74.) At no point while Han was in the office did anyone call Wild.

Han testified as to a different series of events that led her to present the Danish receipt. The overriding theme of Han's testimony was that she purchased the Danish before taking a bite of it. Han testified that she believed she had purchased her Danish around 4:00 p.m., while she was on an unofficial break that only lasted a few minutes (although, as noted, this is inconsistent with the receipt both parties provided to the court that was time stamped at 4:50 p.m.). (Han dep. at 161:11-163:4.) She spotted the Danish and a bottle of water on the salad bar and asked customers to see if it was theirs. When they said no, she decided to purchase the Danish because she had never tried one before. After she took a bite of it she determined she did not like it, so she threw it away in the back area of the prepared foods section. (*Id.* at 166:13-16.) She did not

see either Wild or Stura while eating the Danish. Han testified that after she discarded the Danish, she returned to the salad bar. She then decided to take a longer break and went to look for Stura in the office on the second floor to make this request.

Han thinks she went upstairs to do this at around 4:30 p.m., although she cannot remember the exact time. (Han dep. at 157:24-158:8.) When she arrived at the upstairs office there were "a bunch of people," including Jennifer (presumably Walsh), and Mike (presumably Soucy), and "two or three other people." (*Id.* at 159:15-18.) She saw the Danish and "thought that was really weird." (*Id.* at 173:12-15.) Han showed people in the office her receipt "[b]ecause I was worried that they were misunderstanding. Because they made a similar mistake in the past."[24] (*Id.* at 185:20-24.) Soucy asked Han to leave the office, but she was later called back to the office and told to "punch out" and leave the store. (*Id.* at 178:12-23.)

## VIII. The Ensuing Investigation

Soucy testified that he would have conducted an investigation "immediately following sending Jane Han home," although he also testified that he does not recall whether he did so. (Soucy dep. at 69:2-4; 70:9-10.) He testified that to investigate, he "would have just simply gone to the registers and have them print me a receipt, and then looked at my phone to ensure that the times were the same." (*Id.* at 70:5-7.) He did state at his deposition, however, that he investigated to confirm that the time stamp on the receipt Han presented (4:50 p.m.) matched up with the "real time" when Han purchased the Danish because "the times may be off by a little bit" on Whole Foods' voicemail or other systems. (*Id.* at 69:21-3.)

Walsh was responsible for conducting a formal investigation. After she, Stura, and the others in the office decided to send Han home, Walsh made a photocopy of Han's receipt and

---

[24] Han does not point the court to testimony elaborating on similar past mistakes.

also took statements from Soucy, Stura, Doran, and Eckert. (*See* dkt. 65, Ex. O.) All agreed that the Danish was in the upstairs office prior to 4:50 p.m., the time marked on Han's receipt. (*See id.*) Walsh testified that she relied on these statements in making the decision to terminate Han. She did not, however, ask Han for a statement. Walsh also looked up the employee discount numbers assigned to Han and Wild to identify the purchases they made that day and confirmed they each purchased a Danish on December 23, 2007. Walsh testified that she "think[s]" Wild purchased her Danish before Han did, which was "significant" to her in deciding to terminate Han. (Dkt. 65, Ex. L, Deposition of Jennifer Walsh ("Walsh dep.") at 92:15-93:14.) Walsh anticipated that Han's receipt would show she had purchased her Danish before Wild because Han was "seen eating the Danish before Jane Wild purchased hers." (*Id.* at 93:16-22.) Walsh testified that theft (including eating merchandise before paying for it) constitutes a "major infraction" of Whole Foods policy and that an employee who does not "follow the rules specifically regarding theft will be terminated."[25] (*Id.* at 46:2-22.)

Walsh also consulted with store team leader, Howley, during her investigation. Howley and Walsh decided to terminate Han because the Danish receipt was time-stamped after Han was seen eating the Danish and after the Danish was in the upstairs office. Both Howley and Walsh testified that Han's age, race, gender, and ethnicity were not taken into account in the decision to fire her. (Howley dep. at 54:6-9; Walsh dep. at 94:2-12.)

Han testified that she was not told on December 23, 2007 why she was being asked to leave work. Instead, she did not find out it was for the Danish incident until December 29, 2007, when she was contacted at home. Han returned to Whole Foods that day and met with Howley,

---

[25] Keeping with the theme of inconsistent testimony, Walsh also testified that a major infraction of Whole Foods policy would "not necessarily" result in termination but then seemed to backtrack on that statement, as her testimony cited above indicates. (Walsh dep. at 46:2-5.)

who informed Han that she was fired. When Han saw she was being fired she refused to sign the termination sheet. (*See* dkt. 65, Ex. C.) She told Howley she felt she was being discriminated against for her age, sex, and ethnicity when she was fired.

## IX. Other Whole Foods Employees

Walsh identified other Whole Foods employees who were terminated for violating the employee purchase policy. George Fritcher, Jr., for example, was terminated on September 1, 2003, for consuming an energy drink without paying for it. Fritcher is a white male born in 1973. (Dkt. 65, Ex. P ¶ 6.) On September 3, 2007, a black male employee born in 1986, Normal Liverpool, was terminated after taking two cookies into the break room without paying for them. (*Id.* ¶ 7.) On March 19, 2008, a white male born in 1981, Jared Robertson, was terminated for taking a package of sushi he did not pay for into the break room. (*Id.* ¶ 8.) On June 22, 2007, a Hispanic male born in 1952, Roberto Sanchez, was terminated for attempting to leave the store with a package of toothpaste. (*Id.* ¶ 9.) On March 20, 2008, a white male born in 1988, Jordan Zakheim, was terminated for stealing a cookie.

Han pointed to Amanda, Robert, and Erin as all having received $1.00 raises compared to her $0.25 raise. She also testified that a "Caucasian younger cook, Chris, ate food publicly, was observed by supervisors, eating food . . . for personal consumption, and was not separated from Whole Foods." (Han dep. at 211:23-213:19.) Han explained that she knew this because she witnessed Chris eating his food openly and because, whereas all other employees would keep their receipts next to them as they ate, Chris never did.[26] (*Id.*) Han also complains that she was not provided adequate translators during the investigation to communicate with management even though Spanish speakers were provided with translators. Walsh testified that while she

---

[26] Whole Foods denies this information about Chris but provides no evidence to the contrary.

"never had an issue speaking with" Han, there was a Chinese team member who could help translate if needed. (Walsh dep. at 33:2-34:6.)

Han filed her EEOC charge alleging discrimination based on race, age, and retaliation on April 22, 2008, alleging that the discrimination took place from June 27, 2007 until December 23, 2007. (Dkt. 18 at 11.) She received her right to sue notice on August 31, 2011, and filed suit in this court on November 30, 2011.

## ANALYSIS

### I.     ADEA and Race Discrimination Claims (Counts I, III)

The ADEA prohibits employers from discriminating against employees who are 40 years old or older because of their age. 29 U.S.C. §§ 623(a)(1); 631(a). Title VII makes it unlawful for employers to discriminate against employees because of their race. 42 U.S.C. § 2000e, *et seq*. "In order to succeed in a Title VII lawsuit, a plaintiff must show that he is a member of a class protected by the statute, that he has been the subject of some form of adverse employment action . . . and that the employer took this adverse action on account of the plaintiff's membership in the protected class." *Morgan* v. *SVT, LLC*, 724 F.3d 990, 995 (7th Cir. 2013) (citing *Coleman* v. *Donahoe*, 667 F.3d 835, 863 (7th Cir. 2012) (Wood, J., concurring)).

In responding to a defendant's motion for summary judgment on a Title VII or ADEA claim, a plaintiff may proceed via the "direct" or "indirect" method as laid out in *McDonnell Douglas Corp.* v. *Green*, 411 U.S. 792, 93 S. Ct. 1817, 36 L. Ed. 2d 668 (1973). No matter how the plaintiff proceeds, the Seventh Circuit has warned that although courts may get lost in the "technical nuances" of the two methods, the "central question at issue is whether the employer acted on account of the plaintiff's race (or sex, disability, age, etc.)." *Morgan*, 724 F.3d at 996-

97; *see also Van Antwerp* v. *City of Peoria*, 627 F.3d 295, 297 (7th Cir. 2010).  Han proceeds under both methods.

A.     **Adverse Employment Action**

Under the direct and indirect methods, Han must show that she suffered an adverse employment action.  *See Chaib* v. *Indiana*, 744 F.3d 974, 982 (7th Cir. 2014) ("The requirement that a plaintiff show she suffered an adverse employment action as a result of her employer's alleged discrimination is an element of any Title VII claim, regardless of whether the claim is reviewed under the traditional direct/indirect framework or the less rigid framework our cases have recently suggested."); *Morgan*, 724 F.3d at 995-97.  "While adverse employment actions extend beyond readily quantifiable losses, not everything that makes an employee unhappy is an actionable adverse action."  *Nagle* v. *Vill. of Calumet Park,* 554 F.3d 1106, 1116 (7th Cir. 2009) (quotation marks and citation omitted).  "[A]lthough the definition of an adverse employment action is generous, an employee must show some quantitative or qualitative change in the terms or conditions of his employment or some sort of real harm."  *Id.* at 1116-17 (quotation marks and citation omitted).

"Adverse employment actions for purposes of the federal antidiscrimination statutes generally fall into three categories:  (1) termination or reduction in compensation, fringe benefits, or other financial terms of employment; (2) transfers or changes in job duties that cause an employee's skills to atrophy and reduce future career prospects; and (3) unbearable changes in job conditions, such as a hostile work environment or conditions amounting to constructive discharge."  *Barton* v. *Zimmer*, 662 F.3d 448, 453-54 (7th Cir. 2011).

There is no dispute that Han's termination was an "adverse action," but she identifies other categories of pre-termination events that she argues were also adverse. Namely, Han points to (1) denials of transfers or promotions; (2) elimination of the mid-shift; and (3) receiving a lower raise than her co-workers.

### 1. Failure to Transfer or Promote

#### a. Lateral Transfers

"[J]ust because [an employee] subjectively considered a transfer to have been a more ideal fit or personally advantageous does not render its rejection adverse." *Chaib*, 744 F.3d at 984 (citing *Oest v. Ill. Dep't of Corr.,* 240 F.3d 605, 613 (7th Cir. 2001)). "Otherwise, minor and even trivial employment actions that an employee did not like would form the basis of a discrimination suit." *Oest*, 240 F.3d at 613 ( quotation marks and citation omitted).

Han admits that all transfers she requested (other than the transfer to the cook position, discussed *infra*) were lateral transfers. She requested these transfers because the positions more closely aligned with her interests and would not necessarily require her to enter the freezer. Failure to grant these lateral transfer requests does not constitute adverse employment actions.[27] *Chaib*, 744 F.3d at 984.

---

[27] Han also argues that the lateral transfers could have entailed additional financial opportunities not available to her at the salad bar. For example, when Wild eliminated the salad bar category from the ballot to choose the best employee, Han protests that she was no longer eligible for the $50 award. Even accepting this as true, it does not constitute an adverse employment action because it only amounts to a denial of a bonus at most. *See, e.g., Hunt* v. *City of Markham*, 219 F.3d 649, 654 (7th Cir. 2000) (denial of bonus not an adverse employment action because "[b]onuses generally are sporadic, irregular, unpredictable, and wholly discretionary on the part of the employer"); *EEOC* v. *Outsourcing Solutions, Inc.*, No. 01 C 7037, 2002 WL 31409584, at *11 (N.D. Ill. Oct. 24, 2002) (finding that employer did not commit adverse employment action by restricting employee's commissions "because commissions in this case are like bonuses"). Han testified that in the four years she spent at the Lincoln Park Whole Foods, she won the award twice. There was no guaranty that she would be chosen by her co-workers each year for the award, nor could she reasonably rely on it. Thus, even if Whole Foods eliminated Han's ability to win the award, it was not an adverse employment action.

### b. Promotion

Han argues that she was deprived of the opportunity to advance at Whole Foods when she was denied a transfer to a cook position, which she argues would entail a promotion and raise.[28] Being passed over for a promotion that would come with a raise is an adverse employment action, *see Hunt*, 219 F.3d at 654, whereas being passed over for what "was only a loftier title" is not. *Grayson* v. *City of Chicago*, 317 F. 3d 745, 749-50 (7th Cir. 2003). But as Whole Foods notes, Han never actually applied for any open cook position. "Failure to promote can be an adverse action giving rise to liability, . . . but the plaintiff must first show that she properly applied for the position." *Hill* v. *Potter*, 625 F.3d 998, 1003 (7th Cir. 2010) (citations omitted) (failure to promote claim failed where plaintiff failed to show that employer's proffered reason for not selecting her for different positions—that she failed to apply for the jobs—was pretextual). Han admitted at her deposition that every time she requested to become a cook, she was told that there was no available position. (*See* Han dep. 59:15-19; 94:21-95:6.) Han does not point to any evidence that there were, in fact, open cook positions when she applied.[29] And despite arguing that "younger non-Asian team members that she had trained were promoted

---

[28] Whole Foods attempts to use Han's unclear testimony to support its contention that a transfer to a cook position does not automatically involve a pay raise. (*See* dkt. 79 at 6; *see also* Han dep. at 96:2-5.) But where an employee seeks a promotion "with the raise that would automatically come with it[,] [t]he denial of a promotion is an adverse employment action." *Hunt*, 219 F.3d at 654. Whole Foods points the court to no other evidence of whether a raise is involved in a transfer to the cook position even though such information is clearly within its possession. The court will not use Han's unclear testimony against her with no corroborating evidence. Further, Whole Foods provides no evidence that any attendant raise would be so meager as to be "insignificant." *See Burlington Indus., Inc.* v. *Ellerth*, 524 U.S. 742, 761, 118 S. Ct. 2257, 141 L. Ed. 2d 633 (1998). But because Han never applied for a cook position, this issue is moot.

[29] At one point in her deposition, Han testified that there were "always" openings in the store but it is not at all clear whether this generality applied to cook positions or Han's basis for this broad assertion. (Han dep. at 97:20.) Moreover, she does not testify that she ever applied to an open position. As the court observed earlier, this is an instance where Han has failed to meet the burden to support her claim with facts adduced during discovery.

ahead of her," she again does not point to any job for which she applied but was rejected. (Dkt. 72 at 13-14.) Han's claims of failure to transfer and promote do not amount to adverse employment actions.

### 2. Elimination of the Mid-Shift

Han argues that eliminating the mid-shift was an adverse employment action because it increased her workload. Prior to the elimination, three employees performed the salad bar work. After the elimination, the work was divided between just two employees. She contends this resulted in fifty percent more work with no increase in pay.

Generally, an increase in job responsibilities is not an adverse action. *See Griffin* v. *Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (citation omitted) ("An adverse employment action must be materially adverse, not merely an inconvenience or a change in job responsibilities."); *Haugerud* v. *Amery Sch. Dist.,* 259 F.3d 678, 691-92 (7th Cir. 2001) ("[Receiving] additional responsibilities . . . above that which she should have reasonably [ ] been given" is not an adverse employment action.); *Blackmon* v. *City of Chicago*, 836 F. Supp. 2d 655, 665 (N.D. Ill. 2011) (citation omitted) ("Plaintiff alleges that his workload was increased . . . [but] [s]uch an action also does not rise to the level of materially adverse.").

Although an employer could increase an employee's work load in an effort to punish her or to set her up to fail, Han has not presented evidence to suggest that is the case here. *See Nelson* v. *Advocate Bethany Hosp.*, No. 08 C 2905, 2009 WL 4429767, at *5 (N.D. Ill. Nov. 23, 2009). For example, Han was told she could ask for help when needed. Han argues that she was denied help from team members for "heavy work in the fridge" (Pl. L.R. 56.1 ¶ 106) but does not link the requirement that she perform heavy work to any increase in workload due to the

elimination of the mid-shift. Though Han testified that there were busy days at the salad bar when she was left to work alone, she did not point the court to evidence that she requested help on those days.[30] Again, Han has not sufficiently supported her claim to overcome Whole Foods' summary judgment motion on this point. Further, insofar as Han argues that the elimination of the mid-shift was an adverse employment action because it caused her to work different hours, that argument fails. *See Grube* v. *Lau Indus.*, 257 F.3d 723, 728 (7th Cir. 2001) ("[The] decision to change [the plaintiff's] working hours certainly does not rise to the level of an adverse employment action."). The elimination of the mid-shift was not an adverse employment action.

### 3. Receiving a Lower Raise than Co-Workers

Finally, Han argues that her comparatively lower raise was an adverse employment action and claims that her "non-Asian younger" coworkers—Erin, Amanda, and Robert— received larger raises than she. (Pl. L.R. 56.1 ¶ 110.)

"The denial of a raise—even a purely discretionary one—can be an adverse employment action." *Harper* v. *Fulton Cnty., Ill.*, -- F.3d ----, No. 13-2553, 2014 WL 1363996, at \*4 n.5 (7th Cir. Apr. 8, 2014). Additionally, a plaintiff "might be able to demonstrate that she suffered a materially adverse employment action if she had received a pay raise lower than other similarly situated employees outside her protected class." *Fulmore* v. *Home Depot, U.S.A., Inc.*, No. 1:03 CV 0797, 2006 WL 839463, at \*14 (S.D. Ind. Mar. 30, 2006) (citing *Hildebrandt* v. *Ill. Dep't of Natural Res.*, 347 F.3d 1014, 1030-31 (7th Cir. 2003)). This inquiry merges with into the fourth prong of the *McDonell Douglas* indirect discrimination test and the pretext analysis.

---

[30] For example, Han complained at her deposition that she was left to work the salad bar alone on December 23, 2007 (the day she was terminated) even though it was very busy, but she did not testify that she asked for help. (Han dep. at 113:14-20.)

Putting aside admissibility issues, discussed above, even if Han did receive lower raises than her coworkers, there is no indication that it was discriminatory or an adverse employment action. Han does not demonstrate to the court why her $0.25 raise was unjust, or why her co-workers did not merit higher raises than she. Han received a score of forty-four out of a possible sixty-five points on her April 2007 review. Soucy testified at his deposition both that a score of forty-four "would be a 50-cent raise," and that score would be classified as "average to good," but also that "a 25-cent raise would be anything below the 45 mark." (Soucy dep. at 40:4-21.) While this testimony is internally inconsistent, it is not apparent to the court that Han's $0.25 raise was out of the norm in light of her score. In any event, Han testified that she received a $0.50 raise after she complained to Walsh. (Han dep. at 109:24-110:20.) Moreover, there is no indication that Han's scores were equal to or better than her co-worker's scores, nor has Han suggested that they were. *See Fane* v. *Locke Reynolds LLP*, 480 F.3d 534, 539 (7th Cir. 2007) (employee produced no evidence suggesting employer's "stated reasons for giving her smaller raises than her colleagues were pretextual" where employee "did receive pay increases throughout her employment" and her employer cited "her low evaluation scores as a legitimate reason for the disparity"). Although the court must make all inferences in Han's favor, it again emphasizes that it cannot make up arguments on her behalf out of whole cloth. The $0.25 raise cannot be considered an adverse employment action. The only adverse action Han suffered was her termination.

**B.    Direct Method**

Han proceeds under both the direct and indirect methods to make out her discrimination claim. "'Direct' proof [of employment discrimination] includes both evidence explicitly linking

an adverse employment action to an employer's discriminatory animus, . . . and circumstantial evidence that would permit the trier of fact to infer that discrimination motivated the adverse action." *Morgan*, 724 F.3d at 995 (citations omitted). "If the plaintiff can assemble from various scraps of circumstantial evidence enough to allow the trier of fact to conclude that it is more likely than not that discrimination lay behind the adverse action, then summary judgment for the defendant is not appropriate[.]" *Id.* at 996.

Han relies on circumstantial evidence to create a genuine issue of material fact as to whether Whole Foods' actions in terminating her were motivated by her age.[31] Circumstantial evidence of discrimination often falls into three categories: (1) suspicious timing, ambiguous statements, and other bits and pieces from which an inference of discriminatory intent might be drawn; (2) evidence, statistical or otherwise, that similarly situated employees were treated differently; and (3) evidence that the employer offered a pretextual reason for the adverse employment action. *See Coleman*, 667 F.3d at 860; *Diaz* v. *Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011). Han argues there is sufficient circumstantial evidence to suggest age discrimination. She points to the fact that younger employees received promotions while Han did not and Wild's poor treatment of her, including calling Han an "old woman."[32]

Han argues that the denial of lateral transfers evidences discrimination because younger employees were transferred from department to department. The court has already discussed

---

[31] It appears that Han is only arguing that she succeeds under the direct method on her age discrimination claim. (*See* dkt. 72 at 3 ("Using the direct method of proof, the evidence on the record shows that a reasonable jury could find that Whole Foods discriminated against Han for her age.").) Even if she were arguing her racial discrimination claim under the direct method, it would fail as well.

[32] Han also points to Wild's alleged statements that three employees were terminated because they were "too old" but, as discussed in note 8, *supra*, this evidence is inadmissible.

these transfers and concluded that there was no evidence that Han ever applied for an open position and no evidence that younger employees who requested transfers after Han received the transfers.[33] Nor does she present any other evidence from which a reasonable jury could find any discriminatory animus on Whole Foods' part based on its promotion decisions.

Han also cites her own belief as evidence of discrimination. (*See* Han dep. at 79:16-80:4 (Han felt Wild discriminated against her and tried to "get rid" of her because of "my age; and, secondly, is that I don't speak very good English and I'm Chinese so she doesn't like me. And she, of course—she said I'm old woman. It's not only because of my race, because of my sex and because of my age." ).) But a plaintiff's subjective belief that adverse employment actions were discriminatory or retaliatory is insufficient to create a triable issue of fact. *See Hosick* v. *Chicago State Univ. Bd. of Trs.*, 924 F. Supp. 2d 956, 977 (N.D. Ill. 2013) (citing *Horowitz* v. *Bd. of Educ. Avoca Sch. Dist. No. 37*, 260 F.3d 602, 615-16 (7th Cir. 2001); *Kizer* v. *Children's Learning Ctr.*, 962 F.2d 608, 613 (7th Cir. 1992)). Thus, Han's unsupported comments that Wild disliked her and took certain actions against her because of her age (or race) are insufficient to overcome Whole Foods' motion.

That leaves Han with Wild's comment that Han was an "old woman." Han does not tell the court when Han made it or in what context. A statement is "not probative of discrimination" if it was an "isolated comment" not made "'contemporaneous[ly] with discharge or causally related to the discharge decision-making process.'" *Fleishman* v. *Cont'l Cas. Co.*, 698 F.3d 598, 605 (7th Cir. 2012) (quoting *Gleason* v. *Mesirow Fin., Inc.*, 118 F.3d 1134, 1140 (7th Cir. 1997)). Because Han provides no information as to when Wild made this comment or whether it was in connection with any adverse employment action, Han "failed to link those alleged biases

---

[33] *See* note 13, *supra*.

to the decision" to terminate her. *Harper*, 2014 WL 1363996, at *3 ("The direct method of proof . . . requires evidence leading *directly* to the conclusion that an employer was illegally motivated, without reliance on speculation.") (quoting *Good* v. *Univ. of Chicago Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012)) (emphasis in original).

Finally, even stepping back from the traditional tests into the broader totality-based view recently suggested by the Seventh Circuit, Han has not identified sufficient factual information that would permit a reasonable jury to find that she was terminated because of Wild's—or any other Whole Foods' employee's—discriminatory animus. *See Chaib*, 744 F.3d at 985. And as discussed further below, Whole Foods' reason for terminating Han was not pretextual. Han was terminated after Whole Foods determined that she committed a major infraction by violating the employee purchase policy, a policy of which Han was aware. She does not succeed under the direct method.

## C. Indirect Method

Under *McDonnell Douglas*, a plaintiff relying on the indirect method at summary judgment must show that (1) she was a member of a protected class, (2) she was meeting her employer's legitimate expectations, (3) she suffered an adverse employment action, and (4) similarly situated employees outside of her protected class were treated more favorably. *Fleishman*, 698 F.3d at 609 (quoting *Franzoni* v. *Hartmax Corp.*, 300 F.3d 767, 771-72 (7th Cir. 2002)); *Ptasznik* v. *St. Joseph Hosp.*, 464 F.3d 691, 696 (7th Cir. 2006). If the plaintiff makes this showing, the burden shifts to the defendant to provide a legitimate nondiscriminatory explanation for the adverse action. *Fleishman*, 698 F.3d at 609. The burden then shifts back to the plaintiff, who must raise a question of fact regarding whether her termination was pretextual.

*Id*.  Whole Foods argues that Han failed to meet her *prima facie* burden because she cannot show that she met Whole Foods' legitimate expectations prior to her termination, and she failed to identify other similarly situated employees outside of her protected class who were treated more favorably.[1]

### 1.    *Prima Facie* Case

#### a.    Whether Han Met Whole Foods' Legitimate Expectations

Han must establish that she met Whole Foods' legitimate expectations at the time of the alleged discriminatory acts.  *See Naik* v. *Boehringer Ingelheim Pharm., Inc.*, 627 F.3d 596, 600 (7th Cir. 2010).  Although the Seventh Circuit has cautioned that district courts need not reach the pretextual analysis without first determining whether a plaintiff can make out a *prima facie* case, where "an employer has cited performance issues as the justification for its adverse action, the performance element of the prima facie case cannot be separated from the question whether the employer proffered a nonpretextual explanation for its challenged conduct."  *Duncan* v. *Fleetwood Motor Homes of Ind., Inc.*, 518 F.3d 486, 491 (7th Cir. 2008) (citations omitted); *see also Keeton* v. *Morningstar, Inc.*, 667 F.3d 877, 885 (7th Cir. 2012).  Accordingly, whether Han met Whole Foods' employment expectations will be discussed in the pretext analysis below.

#### b.    Whether Han Suffered An Adverse Employment Action

As already discussed above, Han suffered an adverse employment action when she was terminated.  *See* Part I.A, *supra*.

---

[1]  Whole Foods does not dispute that Han was a member of a protected class under the ADEA. Han was over 40 years old at the time of the events giving rise to this suit. Nor does Whole Foods dispute that Han is of Chinese descent, and is thus in a protected race and national origin class.

### c. Whether Whole Foods Treated Similarly Situated Employees More Favorably

Han must also identify similarly situated employees outside of her protected class who were treated more favorably than she. The similarly situated employee inquiry, which calls for a "flexible" and "common-sense" approach, asks whether there are "enough common features between the individuals to allow a meaningful comparison[.]" *Humphries* v. *CBOCS West, Inc.*, 474 F.3d 387, 405 (7th Cir. 2007), *aff'd* 553 U.S. 442, 128 S. Ct. 1951, 170 L. Ed. 2d 864 (2008). While "[s]imilarly situated employees must be directly comparable to the plaintiff in all material respects, which includes showing that the coworkers engaged in comparable rule or policy violations," *Naik*, 627 F.3d at 600 (internal citation omitted), they need not be "identical in every conceivable way." *Coleman*, 667 F.3d at 846. In order to show that other employees were similarly situated, Han must demonstrate that they "(1) dealt with the same supervisor, (2) were subject to the same standards, and (3) engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id*. at 847 (internal quotation marks and citations omitted).

Han identifies one Whole Foods employee, a cook named Chris, whom she alleges also ate food without having paid for it first but was not fired; she claims that at one point he went so far as to eat an entire chicken. She testified that Chris was "very young," and Whole Foods admitted that Chris is Caucasian. Whole Foods also admitted that Chris "ate food publicly and that he was not separated from Whole Foods" but denied that Chris ate the food "'for personal consumption' rather than pursuant to Whole Foods' policy which allows team members to sample the products they are preparing prior to offering it for sale." (Def. L.R. 56.1 Resp.

¶ 115.)  Once again, Whole Foods failed to present any competent evidence to that effect. Although Han's deposition is difficult to comprehend, the court will very generously read it as stating that Chris openly ate food for personal consumption without paying for it.  (*See* Han dep. 212:11-214:8.)   But Han presents no foundation to support her statement that other supervisors knew that Chris ate food without paying for it other than simply stating that supervisors knew. (*See id.*)  This statement is insufficient to demonstrate the supervisors' knowledge.  *See, e.g., Fenje* v. *Feld*, 301 F. Supp. 2d 781, 816 (N.D. Ill. 2003), *aff'd* 398 F.3d 620 (7th Cir. 2005) ("As to other persons, the witness generally may . . . not [testify] as to the other person's actual state of mind."); *cf. Vazquez* v. *Ctr. States Joint Bd.*, Nos. 04 C 861, 04 C 1798, 2006 WL 695563, at *10 n.8 (N.D. Ill. Mar. 15, 2006) ("An affiant cannot testify to another person's knowledge, and certainly not in the conclusory and speculative terms offered by [the plaintiff].").

Moreover, Chris is not a proper comparator.  Han has not pointed the court to any evidence of Chris's age.  This alone prevents Han from using Chris as a comparator.  *See Barricks* v. *Eli Lilly & Co.*, 481 F.3d 556, 560 (7th Cir. 2007).  Even if the court knew his age, the court does not know who his supervisor was or any other details of his position.  *See Holman* v. *Nicholson*, No. 07 C 4518, 2009 WL 77528, at *5 (N.D. Ill. Jan. 9, 2009) ("In disciplinary cases in which a plaintiff claims that he was disciplined by his employer more harshly than a similarly situated employee based on some prohibited reason, a plaintiff must show that he is similarly situated to the comparator with respect to performance, qualifications, and conduct.") (citing *Radue* v. *Kimberly-Clark Corp.*, 219 F.3d 612, 617 (7th Cir. 2000)). While this is a "flexible" requirement, the plaintiff must show "sufficient commonalities on the key variables."  *Holman*, 2009 WL 77528, at *5.

Han also points to the younger, non-Asian employees she alleges received larger raises than she (Amanda, Robert, and Erin), but they do not help Han make out her *prima facie* case. The court has already determined that Han's allegedly lower raise was not an adverse employment action, and there is no allegation these employees ate food without paying for it and were not terminated. Han also does not provide any other information about these employees, such as their performance scores, supervisors, or anything else of the like. *See Coleman*, 667 F.3d at 847; *Jorden* v. *Walmart Stores, Inc.*, 332 F. Supp. 2d 1172, 1179-80 (C.D. Ill. 2004) (plaintiff who alleged comparators earned higher raises but made "no attempt to indicate, much less compare, the length of employment, starting salary, education, experience, performance, or the salary made at a previous position of any of the purportedly comparable individuals" did not establish they were similarly situated). The record contains no other information about other younger, non-Asian employees who were treated better than she in any way.

For all of these reasons, Han has not made out her *prima facie* case.

### 2. Whether Whole Foods Had A Legitimate, Nondiscriminatory Reason for Its Actions Towards Han

Even if Han were able to satisfy her *prima facie* case, Whole Foods has asserted a legitimate, nondiscriminatory reason for firing Han. Whole Foods asserted that it fired Han pursuant to its policy to terminate employees who eat food without paying for it.[34] Whole Foods' employee manual provided that an employee "may be discharged" for consuming food before paying for it. (GIG at 43, 58.) Walsh testified that "if someone steals, we move forward with separation." (Walsh dep. at 44:20-21.) Whole Foods' belief that Han ate the Danish before paying for it was a legitimate, nondiscriminatory reason for firing her, and it presented evidence

---

[34] Han's complaints about the adequacy of Whole Foods' investigation into her alleged theft are addressed in Part I.C.3, *infra*.

that other employees who consumed or took products without paying for them were fired. (Dkt. 65, Ex. P.) Whole Foods' determination that Han ate the Danish before she paid for it was a legitimate, nondiscriminatory reason for terminating her.

### 3. Whether Han Demonstrated that Whole Foods Acted with Pretext

To show pretext, Han must demonstrate that "(a) the employer's nondiscriminatory reason was dishonest; and (b) the employer's true reason was based on a discriminatory intent." *Perez* v. *Illinois*, 488 F.3d 773, 777 (7th Cir. 2007) (quoting *EEOC* v. *Target Corp.*, 460 F.3d 946, 960 (7th Cir. 2006)). "A plaintiff shows that a reason is pretextual 'directly by persuading the court that a discriminatory reason more likely motivated the defendants or indirectly by showing that the defendants' proffered explanation is unworthy of credence.'" *Blise* v. *Antaramian*, 409 F.3d 861, 867 (7th Cir. 2005) (quoting *Texas Dep't of Cmty. Affairs* v. *Burdine*, 450 U.S. 248, 256, 101 S. Ct. 1089, 67 L. Ed. 2d 207 (1981) (brackets omitted)). Courts look to an explanation's reasonableness to determine if it was honest. *See Duncan*, 518 F.3d at 492.

Han first argues that Whole Foods' nondiscriminatory reason for firing her is pretextual because not all Whole Foods employees who violate the eating policy are fired. She points to Chris, whom she testified ate an entire chicken but was not fired. But, as discussed above, Han has no foundation for testifying that supervisors knew Chris was eating this food. Moreover, it is undisputed that Whole Foods had a policy that it provided to all employees clearly warning that they could be fired for eating food before they paid for it. *See* Part I.C.2, *supra*. Whole Foods has provided evidence of other employees who were fired for stealing food, including three males born in the 1980s, two of whom were white. (Def. L.R. 56.1 ¶ 90.) Han attempts to distinguish these employees, arguing that in each instance the terminated employee signed the

termination form.  That is not true, as a former employee named Roberto Sanchez, who was fired

for taking toothpaste from the store, refused to sign his termination form.  (*See* dkt. 65, Ex. P.4.)

Another employee, Jared Robertson, who was terminated for consuming sushi he had not

purchased, went to the cash register and paid for it after he was asked for a receipt, but he was

terminated nonetheless.  (*Id.* at P.3.)  These termination reports show that Whole Foods enforced

its policy of terminating employees for taking merchandise, even those who did eventually pay

for it, and Han once again offers no evidence to dispute this fact.

Next, Han argues that she did purchase the Danish before she ate it and that the "overall

handling of the so-called investigation and rush to judgment on Han's termination" were

pretextual.  (Dkt. 72 at 20.)  But Han cannot show pretext simply by showing that Whole Foods'

determination was incorrect.  The Seventh Circuit "has long championed an employer's right to

make its own business decisions, even if they are wrong or bad.  Therefore, regardless of

whether it is correct in its beliefs, if an employer acted in good faith and with an honest belief,

we will not second-guess its decisions."  *Green* v. *Nat'l Steel Corp., Midwest Div.*, 197 F.3d 894,

899 (7th Cir. 1999).  Even if a company "may well have been mistaken in its beliefs about its

employee and perhaps should have conducted a more thorough investigation," the employee will

not prevail in demonstrating pretext unless he is able to demonstrate that his employer did not in

good faith believe the reasons it provided for discharging him.  *Id.*; *see Luster-Malone* v. *Cook*

*County*, -- F. Supp. 2d ----, No. 11 C 9227, 2013 WL 6508070, at *7 (N.D. Ill. Dec. 12, 2013)

(employee's claim that employer's reasons for firing her were invalid failed where she did not

show that employer did not "honestly, and in good faith, believe these reasons").  Han can only

show pretext on this basis by proving Whole Foods' "professed reliance on the [investigation

findings] was so unreasonable as to create the inference that [supervisors] subjectively did not believe the [investigation's] conclusions." *Little* v. *Ill. Dep't of Revenue*, 369 F.3d 1007, 1013 (7th Cir. 2004).

Whole Foods' investigation and ultimate decision to terminate Han were reasonable. While there may be some minor disparities in times, the evidence shows that a group of Whole Foods managers was gathered in the upstairs office with the half-eaten Danish before 4:50 p.m., the time on Han's Danish receipt. Han has made no effort to give the court reason to think the computer system was not working that day and that the 4:50 p.m. time stamp was incorrect. The statements of various Whole Foods supervisors generally line up in terms of their time, and, most importantly, they agree that the Danish was in the office before the time stamp on Han's receipt. That Whole Foods did not take a statement from Han is not evidence of pretext,[35] *see Biolchini*, 167 F.3d at 1154, and Han provides the court with no case law to the contrary.[36]

Moreover, Han does not allege that any of the people involved in the investigation had any discriminatory animus. The closest she gets to alleging discrimination during the investigation is her claim that Whole Foods never provided Han with a translator during the investigation. But Han does not point the court to any evidence that she requested a translator, and Walsh testified that she "never had an issue speaking with [Han]" and that Walsh's

---

[35] *See Kariotis* v. *Navistar Int'l Transp. Corp.*, 131 F.3d 672, 678 (7th Cir. 1997) (investigation adequate even though plaintiff asserted that it was "so impulsive and shoddy that it reeks of discriminatory intent"); *see also Moore* v. *Park Ctr., Inc.*, 830 F. Supp. 2d 592, 603 n.12 (N.D. Ind. 2011) (refusing to infer retaliatory intent even though plaintiff was not interviewed in person about his harassment complaints).

[36] The court notes that Han apparently had another Whole Foods employee write out a statement that Whole Foods then attached to the termination sheet. (Walsh dep. at 79:16-22.)

"understanding is that [Han] understood English." (Walsh dep. at 33:23-34:1.) Han cannot now assert that she was discriminated against for not having a translator.

Nor does the fact that it was Wild who reported Han make a difference. An employer may be held liable for discriminatory conduct of a supervisor even where the supervisor was not directly responsible for the adverse action the plaintiff suffered. *See Staub* v. *Proctor Hosp.*, -- U.S. ----, 131 S. Ct. 1186, 1194, 179 L. Ed. 2d 144 (2011). But "if the employer's investigation results in an adverse action for reasons unrelated to the supervisor's original biased action . . . then the employer will not be liable." *Id.* Here, Wild was not even Han's supervisor when she approached Stura about Han's eating the Danish. Moreover, there is no indication that the adverse action here was anything but "entirely justified." Whole Foods conducted its own investigation, checked the computer system to ensure that the time printed on receipts was accurate, and took statements from multiple employees. Howley and Walsh, both human resources personnel, investigated Han's alleged violation of the purchase policy before terminating her. Whole Foods provided evidence of other employees terminated for violating the employee purchase policy. Its investigation here was adequate.

As for Han's other allegations of pretext, the court has already found that Han's termination was the only adverse employment action she experienced and will not rehash its reasoning here. Han has not demonstrated pretext. Her age and race discrimination claims fail.[37]

---

[37] Having so determined, the court need address whether Han's claim fails because she did not comply with Whole Foods' discrimination reporting policy.

**II.     ADEA and Race Retaliation (Counts II and IV)**

Han claims that Whole Foods is liable for retaliation under Title VII and the ADEA for terminating Han after she began to complain about age and race discrimination.  Han can proceed under either the direct method or indirect burden-shifting method of proof detailed in *McDonnell Douglas*.  Under the direct method, Han must show that (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) a causal connection between the two.  *See Kodl* v. *Bd. of Educ. Sch. Dist. 45*, 490 F.3d 558, 562 (7th Cir. 2007) (citing *Moser* v. *Ind. Dep't of Corr.*, 406 F.3d 895, 903 (7th Cir. 2005)).  Under the indirect burden-shifting method, Han must show that she (1) engaged in statutorily protected activity; (2) was meeting Whole Foods' legitimate employment expectations; (3) suffered an adverse employment action; and (4) was treated less favorably than similarly situated employees.  *See Amrhein* v. *Health Care Serv. Corp.*, 546 F.3d 854, 859 (7th Cir. 2008).  If Han makes her *prima facie* case, the burden shifts to Whole Foods to show that a non-retaliatory reason for its actions exist.  *Id*.  The burden then shifts back to Han to show that the proffered reason is pretextual.  *Id*. at 859-60.

The burden on Han is to show that her "protected activity was a but-for cause of the alleged adverse action by the employer," as opposed to showing a lesser "motivating factor" of causation.  *Univ. of Tex. Sw. Med. Ctr.* v. *Nassar*, -- U.S. ----, 133 S. Ct. 2517, 2534, 186 L. Ed. 2d 503 (2013) (Title VII); *Gross* v. *FBL Fin. Servs., Inc.*, 557 U.S. 167, 180, 129 S. Ct. 2343, 174 L. Ed. 2d 119 (2009) (ADEA).  In other words, Han must show that Whole Foods would not have taken any adverse action against her had she not complained about discrimination.  *See Isbell* v. *John Crane, Inc.*, -- F. Supp. 2d ----, No. 11 C 2347, 2014 WL 1153064, at *8 (N.D. Ill.

March 21, 2014) (plaintiff alleging retaliation claims required to prove "that she would not have been terminated for her frequent tardiness had she not filed complaints with the EEOC").

In making out a retaliation claim, "an employment action is adverse if it 'well might have dissuaded a reasonable worker' from engaging in protected conduct." *Kurowski* v. *Shinseki*, No. 13-1947, 2014 WL 595774, at *3 (7th Cir. Feb. 18, 2014) (quoting *Burlington N. & Santa Fe Ry. Co.* v. *White*, 548 U.S. 53, 68, 126 S. Ct. 2405, 165 L. Ed. 2d 345 (2006)). "The scope of the antiretaliation provision [of Title VII] extends beyond workplace-related or employment-related retaliatory acts and harm." *White*, 548 U.S. at 67; *see also Cung Hnin* v. *TOA (USA), LLC*, -- F.3d ----, No. 13-3658, 2014 WL 1758457, at *7 n.2 (7th Cir. May 5, 2014). The same holds true for ADEA claims. *See Barton*, 662 F.3d at 455-56. But "[f]ederal law protects an employee only from retaliation that produces an injury, and, therefore, an employer's retaliatory conduct is actionable only if it would be materially adverse to a reasonable employee." *Stephens* v. *Erickson*, 569 F.3d 779, 790 (7th Cir. 2009) (citing *Burlington*, 548 U.S. at 68-69). The court applies "an objective test, but whether a particular action is materially adverse will depend on the context and circumstances of the particular case." *Id.*

A.    **Direct Method**[38]

As discussed above, the evidence shows that Han complained twice about discrimination: to Walsh after Wild eliminated the mid-shift and to Howley when Han was told she was being terminated.[39] (*See* Han dep. at 111:19-118:20.) Whole Foods argues that Han's allegations fail

---

[38] It is unclear to the court whether Han is proceeding on the direct method as well as the indirect method but the court will examine the viability of Han's claim under the direct method regardless.

[39] While Han may subjectively feel that younger, non-Asian employees were treated better than she, Han does not point the court to evidence that she actually complained on this basis other than the two times mentioned above. (*See* Han dep. at 114:5-11 (Han complained to Walsh that Erin received a higher

because no causal connection exists between any adverse actions and Han's complaint to Walsh about discrimination. The Seventh Circuit recently stated that the factors that may demonstrate discrimination under the direct method—suspicious timing, ambiguous statements or behavior, evidence of similarly situated employees outside the protected group receiving better treatment, or pretext—are "rhetorical tools," and "[t]he ultimate question . . . is whether it is more likely than not that the plaintiff was subjected to the adverse employment action because of his protected status or activity." *Hobgood* v. *Ill. Gaming Bd.*, 731 F. 3d 635, 643-44 (7th Cir. 2013).

As noted above, the definition of adverse actions in the retaliation context is broader than that in the discrimination context. Regardless, Han has failed show she was subjected to any adverse action due to her complaints by failing to "set out the evidence necessary to meet the causation requirement." *Chaib*, 744 F.3d at 987.

### 1. Termination

The timing of Han's termination is not suspicious. The duration of time between the complaint and the incidents belie the existence of a causal connection. *See*, *e.g.*, *Leitgen* v. *Franciscan Skemp Healthcare, Inc.*, 630 F.3d 668, 675 (7th Cir. 2011) ("When an employee's protected conduct is separated by a significant period of time from the adverse employment action, the proximity of the incidents does not support a causal connection between them.");

---

raise because Erin's boyfriend was a supervisor); *id.* at 215:20-23 (Han believes Erin received a larger raise because "she's young and she's white" but did not testify that she communicated this belief to a supervisor); *id.* at 140:20-22 (Han testified that Amanda was "the younger white girl[ ] that got a one-dollar raise" but not that Han complained about this); *id.* at 141:2-18 (Robert was a "20-something young white man" who received a $1.00 raise but no testimony about complaining).) In fact, the only complaint that Han testified she made anywhere near her termination was her complaint to Howley, which she made "when they gave me the termination paper, asked me to sign. And I said that I was treated—mistreated, actually, because of my age, my sex and my ethnic background[.]" (*Id*. at 117:21-24.) But she made this complaint after she was told she was fired. (*See id.* at 118:7-10 ("They said that, You are terminated. And I said, I need assistance of a lawyer. Actually, I feel I was mistreated. And they said, How are you mistreated?").) Her subsequent complaint clearly was not the impetus for termination.

*Temanovich* v. *City of Indianapolis*, 457 F.3d 656, 665 (7th Cir. 2006) (noting that the Seventh Circuit "has held a temporal connection of four months failed to establish a causal connection between a protected activity and an adverse action.").  Han does not point to evidence that she complained about age or race discrimination anywhere close to the time that she was terminated. In fact, the only reasonable interpretation of the evidence presented is that Han's complaint was made at least six months prior to her termination, but more likely closer to two years.  Han testified that she complained to Walsh about her shift change and "mentioned about the age and racial discrimination."  (Han dep. at 111:19-24.)  Han also testified that Wild was present while Han complained to Walsh about the shift elimination.  (*Id.* at 113:6-9.)  The elimination of the mid-shift occurred while Wild was Han's supervisor.  Wild became Han's supervisor in 2005, but Eckert became Han's supervisor approximately six months prior to Han's termination.  (Pl. L.R. 56.1 ¶ 98.)  Although Han does not state exactly when she made this complaint to Walsh, the court finds it would be unreasonable to infer that Han made it any time close to when she was terminated, even taking the evidence in the light most favorable to her.  Han points to deposition testimony to argue that she complained "as recently as approximately November 7, 2007, the time of her second Job Dialogue of 2007" (*id.* ¶ 130), but her deposition does not support this.[40]

---

[40] Han points to a passage from her deposition regarding her November 7, 2007 review.  The only testimony about this review reads:

> Q.  . . .  And then if you look at Exhibit 17, is this are [*sic*] job dialogue from November 7th, 2007?
> A.  Yes, this is my handwriting.
> Q.  Did you get a raise as a result of this job dialogue?
> A.  This is from November 7th, 2007.  I remember that they gave me 50 cents after I got fired.

(Han dep. at 219:17-24.)  No reasonable interpretation of this testimony could stretch it to support Han's claim that she complained about age and/or race discrimination at her November 7, 2007 review.

Additionally, Han was fired pursuant to a clearly established Whole Foods policy. Nor was she the only employee terminated pursuant to this policy. The court simply cannot find that a reasonable jury could conclude that retaliation was a but-for cause of Han's termination.

### 2. Other Potential Adverse Actions

To the extent that the other adverse actions Han alleges—elimination of the mid-shift, failure to transfer, failure to promote, and lower raise—could be considered adverse actions under the retaliation standard, Han still does not make out a claim for retaliation.

Han alleged that she complained to Walsh about discrimination after Wild eliminated the mid-shift. (Han dep. at 111:19-112:7.) Thus, there is no way that her complaints could have led to this change.

As for Han's failure to transfer and failure to promote claims, as discussed at length above, Han provides no indication that she ever applied to open positions. Nor has she made any effort to tie her protected activity to the failure to transfer or promote claims, let alone demonstrate how these complaints were the but-for causes of not being selected potentially inexistent positions. Additionally, it is impossible to tell if her complaints were in some way tied to not being transferred or promoted because she does not tell the court when she attempted to change positions or when she made her complaints.

Finally, regarding her $0.25 raise in April 2007, there is no allegation that she complained about race or age discrimination anywhere near that date, as her only allegation of complaining about this prior to her termination was when her shift was changed when Wild became her manager. Wild became Han's manager in 2005. Again, there is no indication that

her complaints were the but-for cause of the raise; instead, Whole Foods convincingly argues that the raise was tied to her performance review.

Even if the time lag between Han's complaints and the adverse action were not enough to doom Han's claim, Han presents no evidence of a causal connection between her complaints and any adverse action. Han simply has not provided the court with enough evidence to find that any of these allegedly adverse activities would have dissuaded a reasonable employee from engaging in protected conduct.

## B.     Indirect Method

Han fares no better under the indirect method. As discussed, the only adverse employment action she suffered was her termination. She cannot establish that she was meeting Whole Foods' legitimate expectations prior to her termination because Whole Foods determined that she had violated the employee purchase policy.

To establish a *prima facie* case of retaliation, Han would "also needed to present evidence that a similarly situated employee who had not engaged in statutorily protected activity was treated more favorably." *Tomanovich*, 457 F.3d at 666 (citing *Moser*, 406 F.3d at 903). As discussed at length above, the only employee who could possibly be considered similarly situated is Chris, the chicken-eating cook, but Han did not present any other evidence to demonstrate that Chris was similarly situated. *Id.*

Again, even if Han had met her *prima facie* case, her claim would still fail because Whole Foods presented a non-discriminatory reason for firing her: eating the Danish before buying it. And, for the reasons discussed above, Han has not shown that this explanation is pretextual. There is no indication whatsoever that Whole Foods would not have terminated Han

in the absence of her complaints.  Han simply has not presented sufficient evidence the court to overcome Whole Foods' motion for summary judgment.

## CONCLUSION AND ORDER

For the aforementioned reasons, Whole Foods' motion for summary judgment (dkt. 64) is granted.  This case is terminated.

Date:   May 28, 2014